**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | |
|---|---|
| **LILLIE M.[1] O/B/O** ) | |
| **X.T., a minor child,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 7:17-CV-367** |
| ) | |
| **NANCY A. BERRYHILL, Acting** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## REPORT AND RECOMMENDATION

Plaintiff  Lillie M.("Lillie") on behalf of X.T., a minor child, filed this action challenging

the final decision of the Commissioner of Social Security ("Commissioner") finding X.T. not

disabled and therefore ineligible for Supplemental Security Income ("SSI") under the Social

Security Act ("Act").  42 U.S.C. §§ 401–433.  Lillie alleges that the Administrative Law Judge

("ALJ") erred by finding that X.T. does not suffer from a severe  impairment that functionally

equals a listed condition.  I conclude that the ALJ's decision is supported by substantial

evidence.  Accordingly, I **RECOMMEND DENYING** Lillie's Motion for Summary Judgment

(Dkt. No. 16) and **GRANTING** the Commissioner's Motion for Summary Judgment (Dkt.

No. 12).

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence exists to

---

[1] Due to privacy concerns, I am adopting the recommendation of the Committee on Court Administration
and Case Management of the Judicial Conference of the United States that courts use only the first name and last
initial of the claimant in social security opinions.

support the Commissioner's conclusion that X.T. was no longer disabled under the Act.[2]  Mastro
v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001).  "Substantial evidence is such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion; it consists of more than a
mere scintilla of evidence but may be somewhat less than a preponderance."  Craig v. Chater, 76
F.3d 585, 589 (4th Cir. 1996) (internal citations omitted).  The final decision of the
Commissioner will be affirmed where substantial evidence supports the decision.  Hays v.
Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

X.T. was born in August 2006 with a congenital right foot deformity, no right tibia, and
an unstable right knee. R. 341, 358. X.T.'s mother applied for SSI on his behalf in March 2008,
when he was approximately 18 months old, claiming that he was disabled since birth. R. 201.
On August 22, 2008, when X.T. was approximately two years old, the Commissioner found X.T.
disabled as a result of an inability to walk or perform age appropriate activities. R. 84–101, 363.

A child is disabled within the meaning of the Social Security Act if he has a "physical or
mental impairment, which results in marked and severe functional limitations, and ….which has
lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.
§ 1382c(a)(3)(C)(i).  The Social Security regulations provide a three-step sequential evaluation
process for determining whether a minor is disabled.  20 C.F.R. § 416.924.  First, the ALJ must
determine whether the claimant is engaged in substantial gainful activity; if so, the claimant is
not disabled.  Id. § 416.924(a),(b).  Next, the ALJ must determine whether the claimant suffers
from "an impairment or combination of impairments that is severe," if not, the claimant is not

---

[2] Under the Act, a claimant under the age of eighteen is considered "disabled" for purposes of eligibility for
SSI payments if he has "a medically determinable physical or mental impairment, which results in marked and
severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to
last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).

disabled.  Id. § 416.924(a),(c).  To qualify as a severe impairment, it must cause more than a

minimal effect on the claimant's ability to function.  Id. § 416.924(c).  If an impairment is "a

slight abnormality or a combination of slight abnormalities that causes no more than minimal

functional limitations," then it is not severe.  Id.  If the claimant has a severe impairment, the

analysis progresses to step three where the ALJ must consider whether the claimant's

impairment or combination of impairments meets, medically equals, or functionally equals a

listing.  Id. § 416.924(a),(d).  If the claimant has such impairment, and it meets the duration

requirement, the claimant is disabled. Id.

In the August 22, 2008 decision, the Commissioner determined that X.T. was not

engaging in substantial gainful activity; that he suffered from the severe impairment of partial

amputation of right leg with inability to use prosthesis effectively; and that he medically equaled

Listing 101.05(B). R. 84–101, 362.

After the Commissioner awards SSI benefits to an individual under the age of 18 based

upon "an impairment (or combination of impairments) which is likely to improve," the

Commissioner must periodically conduct an evaluation to determine if the individual remains

eligible for benefits. 42 U.S.C. § 1382c(a)(3)(H)(ii)(I). This process is referred to as a

"continuing disability review." 20 C.F.R. § 416.989. When performing the continuing disability

review, the Commissioner utilizes a three-step medical improvement review standard to ascertain

whether the child's disabling condition improved since the most recent favorable decision. See

20 C.F.R. § 416.994a(a); Social Security Ruling (SSR) 05–03p  (Apr. 27, 2005).

First, the Commissioner must determine whether the claimant experienced medical

improvement in his disabling impairment since the comparison point decision. 20 C.F.R.

§ 416.994a (a)(1), (b)(1). If there has been no medical improvement, the claimant continues to be

disabled, unless an exception applies. Id. Second, if the comparison point decision was made on or after January 2, 2001, and there has been medical improvement in the child's condition, the Commissioner must determine whether the impairment the claimant had at the comparison point decision now meets or medically equals the same Listing that it met or medically equaled at the time of the comparison point decision, or whether the impairment functionally equals the Listings. Id. § 416.994a(a)(1), (b)(2); SSR 05–03p. If so, the claimant continues to be disabled, unless an exception applies. [3]  20 C.F.R. § 416.994a(a)(1), (b)(2). Third, if the child's impairment no longer meets or medically equals the same Listing that it met or equaled at the time of the comparison point decision, and does not functionally equal the Listings, the Commissioner must determine whether the claimant is currently disabled under the three-step sequential analysis in 20 C.F.R. § 416.924 for determining whether a child is disabled in the first instance. Id. § 416.994a(a)(1), (b)(3). If not, the claimant ceases to be disabled, and benefits are terminated. Id.

When conducting this Step Three analysis, the Commissioner must consider the six relevant domains[4] of functioning to determine whether a severe impairment functionally equals a listed condition: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).  For a claimant to be found disabled, marked limitations must be assessed in at least two domains or an extreme limitation assessed in one domain.  Id. § 416.926a(a).  "Marked" limitation is defined as "more

---

[3] For purposes of steps one and two of the analysis, there are two (2) groups of exceptions that may terminate benefits even absent medical improvement. Those exceptions do not apply in this case, and thus, there is no need to discuss them in detail. 20 C.F.R. § 416.994a(e) & (f).

[4] The domains "are broad areas of functioning intended to capture all of what a child can or cannot do."  20 C.F.R. § 416.926a(b)(1).

than moderate" but "less than extreme." Id. § 416.926a(e)(2)(i)  A minor has a "marked" limitation in a domain when his impairment(s) interferes seriously with his ability to independently initiate, sustain, or complete activities. Id.  Extreme limitation is defined as "more than marked."  Id. § 416.926a(e)(3)(i).  While extreme limitation is the rating given to the worst limitations, it does not necessarily require a total lack or loss of ability to function. Id.

On December 3, 2014, when X. T. was 8 years old, the Commissioner performed a required continuing disability review, and determined that X.T. was no longer disabled because he was "now able to use his prosthesis without great difficulty." R. 80–82.  This determination was upheld on reconsideration. R. 112–119.  On March 2, 2016, ALJ David Lewandowski held a hearing to consider X.T.'s disability claim.  R. 50–79.  Counsel represented X.T. at the hearing, which included testimony from Lillie, who is X.T.'s Grandmother. Id.

On June 9, 2017, the ALJ entered his decision, agreeing with the Commissioner that X.T. had medically improved such that his comparison point decision impairment no longer met or functionally equaled the listings. R. 26.   The ALJ determined that X.T. was not engaged in substantial gainful activity, and suffered from the severe impairments of right leg amputation, eczema, allergic rhinitis, and Attention Deficit Hyperactivity Disorder ("ADHD"). R. 26.  The ALJ concluded at step three that X.T.'s previously disabling condition had improved, and that his current severe  impairments or combination of impairments did not meet or medically equal the severity of one of the listed impairments. R. 27; see 20 C.F.R. § 416.924.

The ALJ considered the six functional domains and concluded that X.T. had "less than marked limitation[s]" in all six domains. R. 27–43.   Thus, the ALJ concluded that X.T. was no longer disabled as of December 3, 2014. R. 15–43.  Lillie appealed the ALJ's decision, and on June 9, 2017, the Appeals Council denied her request for review.  R. 1–6.  This appeal followed.

## ANALYSIS

Lillie challenges the ALJ's determination that X.T.'s impairments do not meet Listing 101.05(B) after December 3, 2014. Lillie further alleges that X.T. has marked limitations in the domains of attending and completing tasks and moving about and manipulating objects, and therefore continues to be disabled.

## Medical Evidence

X.T. was born with a congenital foot deformity in 2006, and underwent a right through knee amputation in July 2007. R. 353. At the time of the ALJ's decision, X.T. was doing well with his prosthesis. R. 402. In June 2014, David Westberry, M.D., noted that X.T. was functioning well with his prosthesis but it had gotten short associated with growth and X.T. would need to be fitted for a new prosthesis for improved fit. R. 402–03. Specifically, Dr. Westberry noted that X.T.:

> remains quite active. He does not complain of any pain. He has not had any skin breakdown. His prognosis is quite good. He is unable to ambulate without a prosthesis. He is motivated to use a prosthesis. He is quite active; he runs and plays without significant limitations when wearing the prosthesis. With his prosthesis, he has a reciprocating heel-toe gait with moderate Trendelenburg.[5] When standing, he does tilt to the right due to significant shortness in the prosthesis.

R. 402. X.T. was fitted for a new prosthesis (R. 549), which was lengthened in December 2014 and February 2015 and repaired periodically thereafter. R. 550, 555, 557, 561. On October 12, 2015, Dr. Westberry noted that X.T. was doing well, and upon exam he was well-developed, well-nourished, with stable callus formation along the distal stump with no acute evidence of infection or fungal skin abnormality. R. 535–36. He had good range of motion through the hip,

---

[5] A Trendelenburg sign is a physical examination finding associated with various hip abnormalities in which the pelvis sags on the side opposite the affected side during single leg stance on the affected side; during gait, compensation occurs by leaning the torso toward the involved side during stance phase on the affected extremity. See https://medical-dictionary.thefreedictionary.com/Trendelenburg+sign.

and his lower extremities were well perfused with no other abnormalities noted. Id.  Dr.

Westberry discussed X.T.'s potential as a candidate for a distal femoral epiphyslodesis to even

out his leg length over time. R. 536.  On February 12, 2016, X.T. was given a prescription for a

folding wheeled walker, due to skin irritation on his stump which was causing pain with walking.

R. 591.

X.T. sought treatment for allergies and eczema, which consisted of prescribed

medications and advice to take daily baths and apply prescribed creams. R. 423–26, 582.   X.T.'s

dermatologist noted that his eczema was well controlled in December 2014 and August 2015.

R. 433–35, 569–73.

On October 19, 2014, Betty Gillespie, Ph.D., met with X.T. and provided a psychology

report. R. 654–59.  Lillie brought X.T. for the assessment due to concerns about X.T.'s ADHD.

R. 654. Lillie noted that she finds Adderall very helpful in improving his attention and

decreasing his hyperactivity and impulsivity. Id.  Lillie noted that X.T. was in the 3rd grade at

school with a regular curriculum, and was doing well on the A-B honor roll. R. 654–55.  She

noted that X.T. has a 504 Special Education plan so he can have one-on-one assistance as

needed. R. 655.

Dr. Gillespie examined records from X.T's second grade teacher, which described him as

functioning at grade level for written language skills,  but doing poorly in reading and

mathematics. X.T.'s teacher described slight problems with acquiring and using information, and

slight problems with ADHD symptoms secondary to medication which ameliorates these

problems.  She found that he had only mild problems with not focusing long enough to finish a

task, not following multi-step instructions, being a bit disorganized, not completing class

assignments, making carless errors, distracting self and others, having inconsistent work pace,

and inability to finish on time. X.T.'s teacher described him as playing cooperatively with other children, making and keeping friends, and respecting and obeying adults. His teacher found that he had mild problems with not seeking attention appropriately, not following classroom rules, low frustration tolerance, impatience and poor judgment about personal safety. Id.

Lillie reported to Dr. Gillespie that X.T. loves playing video games, playing on the computer, playing soccer and basketball, and skateboarding. R. 655–56. She reported that he is not interested in riding his bicycle. R. 656.

Dr. Gillespie determined that X.T. had average intellectual ability with a tendency to be distractible and make some careless errors. Id. She found that he is hyperkinetic, impulsive and inattentive to a significant degree when not on his prescribed medication, but his medication is very helpful and when he takes it his problems are mild in the classroom. Id. She found that he functions well with adults and other children and is emotionally stable. R. 658.

Dr. Gillespie found that X.T.'s prognosis is good based on his current situation, his good adjustment to medication and his current school and home life. Id. She recommended continued medication management to treat ADHD symptoms, and behavior modifications at school such as the lowest student-to-teacher ratio possible, opportunity for frequent one-on-one instruction as needed, and opportunity for repetition, reinforcers, prompts, redirection, external structure and support as needed. Id. Dr. Gillespie found that X.T. would probably benefit from continued positive peer group activity in sports or Boy Scouts. Id.

On March 26, 2015, state agency physician Linda Dougherty, Ph.D., completed a Childhood Disability Evaluation Form. R. 372–77. Dr. Doherty concluded that the evidence reflected "significant medical improvement" since X.T.'s onset date, and that X.T. was able to run, jump and participate in multiple sports using his prosthesis, without significant

complication. R. 377.  Dr. Doherty found that X.T. had less than marked limitation in the

domains of acquiring and using information, attending and completing tasks, moving about and

manipulating objects, and health and physical well-being. R. 374–75.  Dr. Doherty found that

X.T. had no limitation in the domains of interacting and relating with others and caring for

himself. Id.

On March 27, 2015, state agency physician Leslie Ellwood, M.D., reviewed X.T.'s

records and determined that he had less than marked limitation in the domains of acquiring and

using information, attending and completing tasks, moving about and manipulating objects, and

health and physical well-being. R. 412–413.  Dr. Ellwood found that X.T. had no limitation in the

domains of interacting and relating with others and caring for himself. Id.

X.T.'s records reflect that he visited the school nurse daily from January 2015 through

May 2015 to receive his Adderall medication. R. 604–52.  The school nurse records also reflect

visits for wet pants (R. 593, 597), dry skin and itching (R. 594, 598, 599), bleeding on his right

stump (R. 595), and complaints relating to braces on his teeth (R. 599, 600).

**Testimony**

At the administrative hearing, Lillie testified that X.T. enjoys school and made the honor

roll and that he receives extra help from his teachers at school. R. 55–56.  She testified that he

has friends at school and gets along well with others. R. 58.  With regard to physical activities,

Lillie testified that X.T. can do the same activities in gym class as other children, with exception

of jump rope. R. 59. X.T. testified that his prosthetic leg causes him pain and irritates his skin,

and he began using a wheelchair about two months before the hearing. R. 60.  X.T. also testified

that he treats his eczema with cream and daily baths, and that sometimes he has difficulty

following his teacher's instructions at school because he is concentrating on the irritation and

scratching. R. 62–63.  Lillie testified that X.T. has difficulty wearing his prosthetic leg due to his

eczema. R. 68.   She testified that she goes to school three to four days per week because X.T.

will scratch his leg while in class (R. 72); that X.T. will forget to use the bathroom due to his

ADHD and will occasionally wet his pants (R. 73); and that he becomes upset and cries because

he cannot run and play with other children at his after-school program. R. 72.

    In June 2014, X.T.'s second grade teacher completed a teacher questionnaire with regard

to X.T.'s functioning. R. 282–89.  The teacher indicated that X.T. received special education

services for an hour each day for remediation in reading and math, and his reading and math

level was low but on grade level.  R. 282.  The teacher found that X.T. had slight problems with

acquiring and using information, specifically with understanding school and content vocabulary,

reading and comprehending written material, comprehending and doing math problems,

providing organized oral explanations and adequate descriptions, learning new material, recalling

and applying previously learned material, and applying problem solving skills in class

discussions. R. 283.  The teacher wrote, "[X.T.] does well he just needs a little extra

reinforcement for attention issues." Id.  With regard to attending and completing tasks, the

teacher found that he had a slight problem with focusing long enough to finish an assigned

activity, carrying out multi-step instructions, organizing his things, completing his classwork or

homework assignments, completely his work accurately, working without distracting himself or

others, and working at a reasonable pace. R. 284.  She wrote, "[X.T.] takes medication that helps

him focus."  For interacting and relating with others, the teacher found that X.T. had a slight

problem with seeking attention appropriately and following rules. R. 285.  With regard to

moving about and manipulating objects, the teacher found that X.T. had slight problem with

moving his body from one place to another, demonstrating strength, coordination and dexterity

and planning, remembering and executing controlled motor movements. R. 286.  The teacher wrote, "[X.T.] occasionally will stumble but for the most part he moves better than most of the other kids.  He runs and jumps and has a lot of energy." Id.  The teacher found that X.T. had slight problems with caring for himself in terms of handling his frustration appropriately and being patient, using good judgment regarding personal safety and dangerous circumstances, and knowing when to ask for help. R. 287.  The teacher noted that X.T.'s medication helps him stay calm and focused. R. 288.

On February 8, 2016, X.T.'s fourth grade teacher, Erika Hoyt, wrote a letter to Lillie noting that X.T. will often scratch his leg or complain about pain due to his prosthetic, which requires that he leave the classroom to go to the restroom or school nurse. R. 295. Ms. Hoyt noted that X.T. will occasionally ask to go to the nurse several times a day.  She stated that if X.T. is asked to wait, he is too distracted by the sensation, easily loses his focus in class, and cannot get himself back on task. She further noted that X.T. has a difficult time with following whole group directions, needs individual directions several times during class; and has a difficult time joining in certain classroom activities due to mobility issues. Specifically, she noted that he is often not able to sit on the floor with the class and sits on a chair instead. Id.

On February 22, 2016, X.T.'s physical education teacher completed a letter stating that X.T. had several instances in Physical Education where his prosthetic caused him discomfort or loss of participation. R. 297. He noted that X.T. has to take more breaks that he would like due to discomfort/itching where his prosthetic joins his leg, and on more than one occasion over the last two years he had to come out of class completely due to his prosthetic falling off. Id. He noted that X.T. has become more agile in the last few years, but still falls down from time to time due

to his prosthetic and has trouble sitting for more than a brief time on the floor due to pain and discomfort. Id. He also needs extra time to get up from the floor. Id.

### Listing 101.05(B)

Lillie asserts that the ALJ erred by finding that X.T.'s impairment no longer met or medically equaled Listing 101.05(B). In the June 9, 2016 decision, the ALJ found that medical improvement occurred as of December 3, 2014 because evidence shows that X.T. was able to use his prosthesis without great difficulty, and could participate in most age-appropriate activities when using the prosthesis. R. 19.

Listing 101.05(B ) addresses amputation, and requires amputation of one or both lower extremities at or above the tarsal region, with stump complications resulting in medical inability to use a prosthetic device to ambulate effectively, which have lasted or are expected to last for at least 12 months. 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, 101.05(B). The ability to "ambulate effectively" means being capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out age-appropriate activities.  This requires the ability to travel age-appropriately without extraordinary assistance from school. 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, 1.00B(2)(b).

The ALJ determined that X.T.'s impairment no longer met or medically equaled the listing because the record reflects that X.T. did fairly well with his prosthesis and was able to keep up with other children in his class from a physical standpoint. R. 19.  The ALJ recognized that X.T. began using a wheeled walker about two months before the administrative hearing, but that he was generally able to play sports, skateboard, and walk around on his prosthesis. R. 19. The ALJ noted that X.T.'s second grade teacher observed that he actually moved better than most other children, running and jumping with lots of energy. R. 19, 286.  The ALJ also noted

that despite the possibility of additional surgery in the future, X.T.'s recovery from such surgery

would be four to six weeks, which would not establish 12 months of actual or expected inability

to ambulate effectively.  R. 20. The ALJ further noted that X.T.'s treatment providers found that

he was doing well at his recent check ups.  Overall, the ALJ found that although X.T. was having

some episodes of discomfort with regard to his stump, his problems were not of listing-level

severity. R. 20.

Lillie asserts that the ALJ erred in this finding and that X.T. continued to meet or

medically equal Listing 101.05(B) after December 3, 3014.  Pl. Br. Summ. J. p. 14.  Lillie notes

X.T.'s ongoing battle with eczema, which complicates his use of a prosthesis.   Lillie also points

to records from X.T.'s teachers indicating that he occasionally has mobility issues or is unable to

participate in physical education class.  Lillie relies upon her testimony that X.T.'s doctor and

school principal decided that it would be better for X.T. to use a wheeled walker at school, rather

than his prosthetic, because the prosthetic was causing significant interruptions at school. R. 73.

Accordingly, Lillie asserts that the evidence reflects that X.T. continues to have complications

with his prosthesis such that he meets or medically equals Listing 101.05(B).

Substantial evidence supports the ALJ's finding that X.T. did not experience stump

complications that resulted in the medical inability to use his prosthesis to ambulate effectively

for at least twelve months. As the ALJ noted, the evidence reflects that X.T. was able to keep up

with other children, play sports, skateboard, and run and jump with lots of energy. R. 19–20.

The ALJ acknowledged that X.T. was having recent issues with his stump and was prescribed a

wheeled walker, but that such issues arose only two months prior to the administrative hearing

and X.T. remained active.   Lillie does not point to any evidence that the ALJ failed to consider,

or assert that the ALJ applied the wrong legal standard.  Rather, Lillie's argument requests that

the Court re-weigh the evidence and arrive at a different conclusion than the ALJ.  This is not the standard of review, and if substantial evidence supports the ALJ's decision it should not be disturbed.

## Functionally Equal Listing of Impairments

Lillie also asserts that the ALJ erred in finding that his impairments, both at the time of the comparison point decision and currently, do not functionally equal the Listing of Impairments.[6]  For a claimant to be found disabled, marked limitations must be assessed in at least two of the six domains or an extreme limitation assessed in one domain.  Id. § 416.926a(a).  Here, the ALJ found that X.T. had less than marked limitations in all domains. Lillie asserts that X.T. has marked limitations in the domains of attending and completing tasks, and moving about and manipulating objects.

### Attending and Completing Tasks

Lillie asserts that the ALJ failed to acknowledge that X.T.'s complications arising from his prosthesis distract him and take him off task frequently throughout the day, resulting in a marked limitation in attending and completing tasks. Pl. Br. Summ. J. p. 19.  Lillie refers to records reflecting that X.T. has eczema on his right leg that is irritated by his prosthesis.  Lillie also relies upon the letter from X.T.'s fourth grade teacher that X.T. frequently inquires if he can scratch his leg during classroom instructional time, and asks to go to the restroom or nurse several times a day, and is easily distracted by the sensation. R. 295.  Lillie notes that X.T. started using a wheeled walker at school because he was scratching his leg and making it bleed.

---

[6] The ALJ's decision and plaintiff's brief discuss the functional equivalence section separately as to X.T.'s impairment at the time of the comparison point decision (right amputated leg) and his impairments at the time of the recent ALJ decision (right leg amputation, eczema, allergic rhinitis, and ADHD). I am combining the discussion for purposes of this opinion and consider whether X.T.'s impairments both at the time of the comparison point decision and at the time of the ALJ's decision functionally equal the listings.

R. 61.  Lillie also points to Dr. Gillespie's note that X.T. walks with a slight limp with an alternating gait, and does not ride a bicycle. R. 657.

In the domain of attending and completing tasks, the Commissioner considers how well the child is able to focus and maintain attention and how well he is able to begin, carry through and finish activities, including the child's pace at which he performs activities and the ease with which he changes activities. See 20 C.F.R. § 416.962a(h).  The Social Security Administration ("SSA") indicates that a school-age child without impairment should be able to focus his attention in order to "follow directions, remember and organize [] school materials" and complete assignments. Id. § 416.926a(h)(2)(iv).  The child should be able to "concentrate on details," "not make careless mistakes," "stay on task," and be able to participate in group sports and complete chores. Id.

The ALJ discussed X.T.'s records reflecting that he sometimes has problems focusing due to stump discomfort, but noted that those problems were intermittent and variable. R. 22. The ALJ noted that, "[d]espite these difficulties, [X.T.] is apparently able to perform his assigned chores at home, including folding laundry and washing dishes; help pick up his toys; and sometimes do homework without close supervision." R. 22. The ALJ noted that X.T. is able to read books and play sports. R. 22.  The ALJ further noted that X.T.'s second grade teacher found that he had no problem paying attention when spoken to directly; sustaining attention during play/sports activities; refocusing to task when necessary; carrying out single-step instructions; waiting to take turns; and changing from one activity to another without being disruptive. R. 39, 284.  The teacher assessed only slight problems with focusing long enough to finish an assigned activity or task; carrying out multi-step instructions; organizing his own things or school materials; completing class/homework assignments; completing work accurately without careless

15

mistakes; working without distracting self or others; and working at a reasonable pace; finishing on time. Id.  X.T.'s teacher noted that his medication helps him focus. Id.

The ALJ found that X.T's second grade teacher's assessment was consistent with the record evidence that X.T.'s physical symptoms are intermittent and variable, and that he had a good treatment response to Adderall. Id.  The ALJ noted Dr. Gillespie's finding that X.T. has problems with fidgeting, being distractible and not keeping attention on task; moderate problems being out of his seat; and mild problems blaming others, not keeping hands to self, not waiting his turn, talking out of turn, being too loud, talking too much, and interrupting others. R. 39, 658. The evidence reflected that X.T. could sit through a meal at a restaurant, and could sit through a five-minute book and a movie or television program. Id. The ALJ noted that X.T. was of average intellectual ability even without his medication. R. 39, 656. He also noted X.T.'s ability to read Goosebumps books and play group sports, which demonstrate a good ability to attend and complete tasks. Id. Overall, the ALJ found the second grade teacher's assessment of "slight" problems with attending and completing tasks consistent with the evidence. Id.

Substantial evidence supports the ALJ's determination that X.T. suffers from a less than marked limitation with attending and completing tasks.  The ALJ considered the medical evidence, the teacher reports and the testimony of Lillie and X.T. in the record, and noted that the evidence did not reflect more than slight limitations in this domain.  While the evidence reflects that X.T. has been distracted by the combination of his eczema and prosthesis, as the ALJ noted, those issues are intermittent in the record and variable.  Further, the record reflects that although X.T. has ADHD, he has a good response to Adderall, and his treatment providers and teachers noted that it helped him function at school. Notably, no medical provider or teacher found that X.T. was markedly impaired in this domain.

Specifically, X.T.'s second grade teacher noted no more than slight limitations in all of the domains. With regard to attending and completing tasks, his teacher found that X.T. had only slight problems with some activities and that medication helps him focus. R. 284 . The regulations applicable to a claim for child's supplemental security income benefits recognize that school records, including reports from teachers, are "important sources of information" regarding a claimant's impairment(s) and its effects on his ability to function. 20 C.F.R. § 416.924a(b)(7). The regulations provide that, if you go to school, "we will ask your teacher(s) about your performance in your activities throughout your school day," and "[w]e will consider all the evidence we receive from your school, including teacher questionnaires…" Id.

Lillie asserts that the ALJ "ignored evidence" from X.T's fourth grade teacher, Ms. Hoyt, that he frequently inquires during classroom instructional time if he can scratch his leg and complains of pain due to his prosthetic. R. 295. The ALJ did not ignore this evidence, but rather recognized that X.T. sometimes has problems focusing due to stump discomfort. R. 22. The ALJ considered this evidence together with the school nurse records, teacher report and other treatment records reflecting that X.T.'s distractibility from his eczema and prosthesis was variable and intermittent. R. 22. Indeed, X.T. was prescribed a wheeled walker just two months before the administrative hearing, and prior to that time, his eczema was noted as "well controlled," (R. 570), and he was doing well with his prosthesis. R. 61–62. The nurse notes reflect that X.T. visited a total of three times between January 2015 and February 2016 for complaints related to itching and his prothesis and usually returned to class after a few minutes. R. 595, 598, 599.

Overall, Lillie's arguments are based on specific evidence that supports her outcome and requests this Court reverse the ALJ's conclusions based on this evidence. This cannot be done.

At this stage, the only question is whether the ALJ's finding is supported by substantial evidence if it is based on "relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). Furthermore, where "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled," the Court must defer to the Commissioner's decision. Id. at 653.

### **Moving About and Manipulating Objects**

Lillie asserts that the ALJ erred by finding that X.T. had a less than marked limitation in the domain of moving about and manipulating objects. Pl. Br. Summ. J. p. 19. This domain considers how well a child is able to move his body from one place to another and how a child moves and manipulates objects. The regulations provide that a school-age child without an impairment should have gross motor skills that let him move at an efficient pace at school, home and throughout the neighborhood. The child's increasing strength and coordination should expand his ability to enjoy a variety of physical activities, such as running and jumping, and throwing, kicking, catching, and hitting balls in informal play or organized sports. The child's development of fine motor skills should enable him to do things like use many kitchen and household tools independently, use scissors, and write. 20 C.F.R. § 416.926a(j)(2)(iv).

The ALJ found that X.T. had a less than marked limitation in moving about and manipulating objects due to evidence that he is able to run, jump, play sports, and do other age-appropriate activities when wearing his prosthesis. R. 24. The ALJ noted that X.T. was not interested in riding his bicycle, and his stump was occasionally sore, irritated or tender. R. 24. The ALJ further noted that X.T. enjoyed playing sports with other children, walked with a slight limp, could grasp a pencil appropriately, and was doing well overall with his prosthesis when the fit was adjusted. R. 24. The ALJ noted X.T.'s second grade teacher's conclusion that X.T. had

18

only a "slight problem" with this domain, and that despite the occasional stumble, X.T. moved

"better than most of the other kids.  He runs and jumps and has lots of energy." R. 40, 286.

The ALJ also noted that X.T. started using a wheeled walker two months before the

hearing, but found that X.T. gave somewhat contradictory responses about his level of

discomfort from itchiness and stump problems at other times. R. 41. Specifically,  X.T. testified

that he does all the same activities as other students, except he cannot jump rope with two feet at

the same time. R. 41, 59.  X.T. testified that he can run around, walk and jump on one foot. Id.

The ALJ noted Lillie's testimony that X.T.'s discomfort from his prosthesis and skin condition

are persistent, but that other evidence reflects that X.T. typically saw the school nurse no more

than two or three times for those issues and usually went back to class after a few minutes. R. 41.

Overall, the ALJ found that many of X.T.'s issues with his prosthesis were related to outgrowing

the device, or hardware malfunctions, and were remedied by replacements and adjustments over

time. R. 41.

Substantial evidence supports the ALJ's conclusion that X.T. has "less than a marked

impairment" with the domain of moving about and manipulating objects.  The evidence reflects

that X.T.  can move at an efficient pace at school and home, enjoys a variety of physical

activities, and has no issues with fine motor skills like writing.  The evidence further supports the

ALJ's conclusion that X.T.'s ongoing difficulties with his prosthesis have varied over time,

depending upon his changing skin symptoms and the fit of his prosthesis. R. 41.

Lillie asserts that the ALJ ignored evidence from X.T.'s school of his ongoing issues and

problems with pain and itching of the prosthesis. Pl. Br. Summ. J. p. 27. However, the ALJ

considered the letters from both X.T.'s physical education teacher and his fourth grade teacher

reflecting his recent difficulties with wearing his prosthesis.[7] R. 28, 297. ALJ referenced the

physical education teacher's letter in his analysis, noting

> reports from the claimant's teachers that the claimant complains of prosthetic-
> related pain and itching during class, causing some of interference with learning.
> However, both of the teachers' letters are very vague as to the frequency of the
> claimant's prosthetic-related interruptions. A review of the notes kept by the
> school nurse suggests that the actual frequency was rather low: the claimant
> typically saw the nurse no more than two or three times per month for those
> issues, and was usually sent back to class after a few minutes.

R. 35–36 (internal citations omitted).   The ALJ gave the fourth-grade teachers' letters some

weight, finding that the limitations they described are not clearly quantified, expressing the

frequency of classroom interruption with words like "on occasion," "often," and "on more than

one occasion."  R. 38. The ALJ found that the teacher's descriptions seemed largely compatible

with a "less than marked" limitation in the six domains of functioning. Id.  The ALJ gave the

assessment by X.T.'s second grade teacher greater weight, finding it to be fully explained, well-

supported and most consistent with the totality of the evidence. R. 36–38.

### Subjective Complaints of Limitations

Lillie claims that the ALJ's conclusion that X.T.'s allegations are not entirely consistent

with the evidence of record is not supported by substantial evidence.  Lillie also asserts that the

ALJ improperly characterized X.T.'s teachers' letters as "vague." Pl. Br. Summ. J. pp. 29, 30.

Under the regulations implementing the Social Security Act, an ALJ follows a two-step

analysis when considering a claimant's subjective statements about impairments and symptoms.

Soc. Sec. Ruling 16-3p Titles II & Xvi: Evaluation of Symptoms in Disability Claims, SSR 16-

---

[7] Lillie asserts that the ALJ erred by failing to mention the letter from X.T.'s physical education teacher in his analysis of X.T.'s impairment at the time of the comparison point decision as it relates to the domain of moving about and manipulating objects. R. 23, Pl. Br. Summ. J. p. 20. While the ALJ does not specifically reference the physical education teacher's letter in that section, he references evidence "discussed in greater detail elsewhere in this decision." R. 24.  The ALJ discusses the letter in the evidence portion of his opinion and when analyzing X.T.'s limitation in the domain of moving about and manipulating objects with regard to all of X.T.'s severe impairments. While the ALJ is required to review all of the evidence on the record, the ALJ is not required to restate the evidence in every relevant portion of the decision. See McCarney v. Apfel, 28 Fed. Appx. 277, 279 (4th Cir. 2002).

3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017) [8]; 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c).

First, the ALJ looks for objective medical evidence showing a condition that could reasonably

produce the alleged symptoms, such as pain. Id. at *3, §§ 404.1529(b), 416.929(b). Second, the

ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to

determine the extent to which they limit the claimant's ability to work. Id. §§ 404.1529(c),

416.929(c). In making that determination, the ALJ must "examine the entire case record,

including the objective medical evidence; an individual's statements about the intensity,

persistence, and limiting effects of symptoms; statements and other information provided by

medical sources and other persons; and any other relevant evidence in the individual's case

record." Id. (emphasis added).

    A reviewing court gives great weight to the ALJ's assessment of a claimant's statements

and should not interfere with that assessment where the evidence in the record supports the

ALJ's conclusions. See Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984). "If the

claimant is a child who does not describe, or cannot adequately describe, his symptoms, the ALJ

'will accept as a statement of [the child's] symptom(s) the description given by the person who is

most familiar with [the child], such as a parent, other relative, or guardian.'" Barnes ex rel. T.J.

v. Colvin, No. 4:12-CV-254-D, 2014 WL 126039, at *4 (E.D.N.C. Jan. 13, 2014) (unpublished)

(quoting 20 C.F.R. § 416.928(a)). "The ALJ must make specific findings concerning the

credibility of the [caregiver's] testimony, just as he would if the child were testifying." Id.

(quoting Dew ex rel. K.W. v. Colvin, No. 4:12-cv-129, 2013 U.S. Dist. LEXIS 122536, at *21,

---

[8] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that
the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1). Once published, these rulings are binding
on all components of the Social Security Administration. Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984); 20
C.F.R. § 402.35(b)(1). "While they do not have the force of law, they are entitled to deference unless they are
clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995).

2013 WL 4523617, at *8 (E.D.N.C. Aug. 27, 2013) (unpublished)).  The ALJ is not required to

accept the caregiver's testimony about the child's symptoms at face value.  Meadows v. Astrue,

No. 5:11CV00063, 2012 WL 3542536, at *9 (W.D. Va. Aug. 15, 2012) (citing SSR 96-7p)

(noting that the ALJ must "weigh [a claimant's testimony about her symptoms] along with all of

the evidence, including not only the objective medical evidence, but statements and other

information provided by physicians or psychologists and other persons about her symptoms and

how they affect her and any other relevant evidence in the case record.")  Further, a reviewing

court will defer to the ALJ's credibility finding except in those "exceptional" cases where the

determination is unclear, unreasonable, contradicts other findings of fact, or is based on an

inadequate reason or no reason at all.  See Bishop v. Comm'r of Soc. Sec., 583 F. App'x 65, 68

(citing Edeco, Inc. v. NLRB, 132 F.3d 1007, 1011 (4th Cir. 1997)).

After reviewing the entire record, I find that substantial evidence exists to support the

ALJ's determinations regarding X.T.'s statements.  The ALJ reviewed Lillie and X.T.'s

testimony in detail, along with the letters from X.T.'s teachers. The ALJ stated:

> After considering the evidence of record, the undersigned finds that the claimant's
> medically determinable impairments could reasonably be expected to produce the alleged
> symptoms; however, the statements concerning the intensity, persistence and limiting
> effects of these symptoms are not consistent with the evidence for the period since
> December 3, 2014, to the extent they are inconsistent with finding that the claimant does
> not have an impairment or combination of impairments that functionally equals the
> listings, as explained below.

R. 35.  Thereafter, the ALJ outlined his reasons for this determination, including finding that the

reports from X.T.'s fourth grade teachers were vague as to the frequency of X.T.'s prosthetic-

related interruptions, and the school nurse notes reflecting a low frequency of visits related to

prosthetic issues. Id.  The ALJ noted that the majority of X.T.'s issues with his prosthesis related

to outgrowing the device or hardware malfunctions, which were remedied by replacements and

adjustments. R. 36.  The ALJ referenced treatment notes reflecting that X.T. was doing well, and

X.T.'s statements that he could do most of the same physical activities as his peers. Id. The issue

on appeal is whether the ALJ's decision is supported by substantial evidence, and I find that

substantial evidence supports the ALJ's finding regarding X.T.'s statements.

## CONCLUSION

For the foregoing reasons, I **RECOMMEND AFFIRMING** the final decision of the

Commissioner, **GRANTING** summary judgment to the Commissioner, **DENYING** Lillie's

motion for summary judgment and **DISMISSING** this case from the Court's docket.

The Clerk is directed to transmit the record in this case to Glen E. Conrad, United States

District Judge, and to provide copies of this Report and Recommendation to counsel of record.

Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to

this Report and Recommendation which must be filed within fourteen (14) days hereof.  Any

adjudication of fact or conclusion of law rendered herein by me that is not specifically objected

to within the period prescribed by law may become conclusive upon the parties.  Failure to file

specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well

as to the conclusion reached by me may be construed by any reviewing court as a waiver of such

objections, including a waiver of the right to appeal.

Entered:  November 20, 2018

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge